IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHAD MCGINTY, | : Civil No. 1:25-CV-1965 |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : (Chief Magistrate Judge Bloom) |
| FRANK BISIGNANO, | : |
| Commissioner of Social Security, | : |
| | : |
| Defendant. | : |

MEMORANDUM OPINION

## I.    Introduction

Chad McGinty filed applications under Titles II and XVI of the Social Security Act for disability benefits and supplemental security income on May 26, 2023.  Following a hearing before an Administrative Law Judge ("ALJ"), the ALJ found that McGinty was not disabled from his alleged onset of disability, June 10, 2021, through the date of the ALJ's decision, November 26, 2024.[1]

McGinty now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence.  After a review of the record, and mindful of the fact that substantial evidence "means only—'such

---

[1] Tr. 35-46.

relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'"[2] we conclude that substantial evidence supports the ALJ's findings in this case.  Therefore, we will affirm the decision of the Commissioner denying this claim.

## II.   Statement of Facts and of the Case

Chad McGinty filed for disability benefits and supplemental security income, alleging disability due to a host of physical and mental health impairments, including bone spurs in his hips, trouble walking, chronic pain, bursitis in his shoulders, overhead lifting issues, a heart condition, 90% artery blockage, fatigue, chest pains, and a heart attack.[3] McGinty was 45 years old at the time of his alleged onset of disability, had a high school education, and had no past relevant work.[4]

The administrative record in this case reveals that McGinty treated with a podiatrist prior to his alleged onset of disability in September of 2019.[5]  He complained of generalized, global pain in his bilateral feet, and

---

[2] *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).
[3] Tr. 106.
[4] Tr. 45.
[5] Tr. 303.

2

it was noted that he treated with a pain specialist in the past.[6]  An orthopedic examination revealed pes cavus deformities bilaterally, intact sensation, normal deep tendon reflexes, and 5/5 strength in his lower extremities.[7]  The provider prescribed a topical medicine and discussed surgical options, although he noted that he did not think surgery was in McGinty's best interest at that time.[8]

McGinty was seen by his primary care provider, Jaclyn Williams, PA-C, in September of 2020.[9]  PA Williams noted McGinty's history of a heart attack in August of 2019; a recent testosterone deficiency, for which he was started on medication; and his complaints of chronic pain in his feet.[10]  She noted that McGinty was taking Methadone and receiving injections, which helped his pain.[11]  She further noted that McGinty was diagnosed with bone spurs in his hips.[12]  PA Williams referred him to

---

[6] *Id.*
[7] *Id.*
[8] Tr. 303-04.
[9] Tr. 368.
[10] *Id.*
[11] *Id.*
[12] *Id.*

Physical Medicine and Rehabilitation for his chronic pain.[13]    At a cardiology follow up in October, it was noted that McGinty was still struggling with his chronic pain.[14]  PA Williams' notes from April of 2021 indicated that McGinty never followed up with the rehabilitation referral.[15]

In November of 2022, McGinty established care with a new provider for chronic hip, foot, and shoulder pain.[16]  It was noted that McGinty had treated with pain management, but his provider was retiring.[17]  McGinty attributed his hip pain to bone spurs, his foot pain to a congenital defect, and his shoulder pain to arthritis.[18] He reported being active with a home exercise program, and that his shoulder injections were "extremely beneficial."[19]  On examination, he had no edema, moved his bilateral upper and lower extremities without significant pain or difficulty, and

---

[13] Tr. 370.
[14] Tr. 308.
[15] Tr. 374.
[16] Tr. 326.
[17] *Id.*
[18] Tr. 327.
[19] *Id.*

had an antalgic gait with a cane.[20]  The provider's plan was to continue his shoulder injections and order an MRI of his shoulders.[21]  McGinty received shoulder injections throughout the rest of 2022 and into June of 2023, each time reporting significant improvement in his pain and functioning for several months.[22]

McGinty saw PA Williams in March of 2023, at which time it was noted that McGinty was having trouble finding someone to manage his Methadone prescription.[23]  McGinty reported increased pain, that he sometimes took extra medication, causing his prescription to run out, and that he was experiencing withdrawal.[24]  McGinty was cautioned to take his medication as prescribed.[25]  At a cardiology follow up in August, McGinty reported an ability to climb stairs if he has to, walk around a store, and carry groceries.[26]

---

[20] Tr. 328.
[21] Tr. 329.
[22] Tr. 332, 339, 345, 351, 610, 615, 621.
[23] Tr. 390.
[24] Tr. 390-92.
[25] Tr. 392.
[26] Tr. 537.

McGinty presented to the Lebanon Pain Relief Center in October of 2023.[27]  He reported chronic pain that was moderate in severity but constant.[28]  It was noted that McGinty requested an increased dose of Methadone, and that there was "some self-escalation of his dose in the past[,]" which the provider noted was dangerous and violated the opioid agreement.[29]  On examination, McGinty had an antalgic gait with a cane, moderate pain with his hips with motion, mild pain in his feet, and decreased motor strength in his lower extremities "secondary to effort due to pain in hips."[30]

Ultimately the provider declined to increase McGinty's Methadone dose, reasoning that he was "concerned about his level of pain meds and his past and current self escalation."[31]  The provider noted that McGinty was "not interested in what I have to offer and only wants to increase his methadone[,]" which the provider was not comfortable doing.[32]  McGinty

---

[27] Tr. 408.
[28] *Id.*
[29] *Id.*
[30] Tr. 415.
[31] *Id.*
[32] Tr. 415-16.

6

treated with PA Williams the following month, at which time it was noted that McGinty "was not happy with his most recent pain management consult."[33]

McGinty underwent an internal medicine examination in February of 2024 with Nurse Practitioner Karena Hammon.[34]  McGinty reported his pain as aching, throbbing, and shooting, and he presented to the examination with a cane.[35]  NP Hammon noted that he had weakness and loss of range of motion in his upper extremities on examination.[36] During the examination, McGinty's gait without a cane was "extremely unsteady and unsafe"; he walked with a limp with his cane; he could squat only 5 percent; and he was unable to tandem walk or walk on his heels and toes.[37]  His joints were stable and nontender, his straight leg raise testing was negative, he had no sensory or fine motor deficits, and his strength was 3/5 and 4/5 in his upper and lower extremities,

---

[33] Tr. 78.
[34] Tr. 432-36.
[35] Tr. 432.
[36] *Id.*
[37] Tr. 434.

respectively.[38]   NP Hammon filled out a medical source statement regarding McGinty's limitations, in which she opined that McGinty could never lift or carry any weight due to his decreased range of motion and extremity strength; he could sit for six hours and stand and walk for one hour in an eight-hour workday; he required a cane for ambulation; he could never reach in any direction; and he could never climb ladders, ropes, or scaffolds or balance.[39]

McGinty treated with PA Williams in April of 2024, at which time she noted that McGinty's chronic pain was stable, and they discussed medical marijuana as a possible option for his pain.[40]   In July, at an orthopedic consultation for his shoulder pain, it was noted that he had received at least seven injections from pain management, and that he engaged in home exercises.[41]   McGinty's MRI imaging from December of 2023 showed evidence of a rotator cuff tear.[42]   The provider noted that

---

[38] Tr. 434-35.
[39] Tr. 439-44
[40] Tr. 84.
[41] Tr. 637.
[42] Tr. 641.

McGinty had significant pain and weakness on examination, and he ordered updated MRIs to assess for potential retraction and atrophy.[43]

PA Williams filled out a medical source statement in September of 2024.[44] Williams noted McGinty's pain as moderate to severe in his feet, shoulders, and hips, and she opined that his pain constantly interfered with his attention and concentration.[45] She further opined that he was capable of only low stress jobs, would need to be able to shift positions at will, would need unscheduled breaks every few hours for ten minutes, and need a cane to ambulate.[46] Williams indicated that McGinty could sit, stand, and walk less than two hours in an eight-hour workday, and that he would be absent more than four days per month.[47]

It is against the backdrop of this record that an ALJ held a hearing on McGinty's disability application on October 7, 2024.[48] McGinty and a Vocational Expert ("VE") both appeared and testified at this hearing.[49]

---

[43] *Id.*
[44] Tr. 455-59.
[45] Tr. 455-56.
[46] Tr. 456-57.
[47] Tr. 458.
[48] Tr. 52-67.
[49] *Id.*

Following this hearing, on November 26, 2024, the ALJ issued a decision denying McGinty's application for disability benefits.[50]  The ALJ first concluded that McGinty had not engaged in substantial gainful activity since his alleged onset of disability, June 10, 2021.[51]  At Step 2 of the sequential analysis that governs disability claims, the ALJ found that McGinty's degenerative joint disease of the bilateral hips and shoulders were severe impairments.[52]  At Step 3, the ALJ concluded that none of these impairments met or equaled the severity of a listed impairment under the Commissioner's regulations.[53]

Between Steps 3 and 4, the ALJ then concluded that McGinty:

[H]a[d] the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he is capable of standing and/or walking for no more than four (4) hours in an eight (8) hour workday. The claimant must use a handheld assistive device for ambulation. The claimant is capable of occasional performing of postural movements, but never climbing of ladders, ropes or scaffolds. The claimant must avoid concentrated exposure to temperature extremes, wetness and humidity and even moderate exposure to dangerous machinery and unprotected heights.[54]

---

[50] Tr. 32-51.

[51] Tr. 37.

[52] *Id.*

[53] Tr. 38-39.

[54] Tr. 39.

In reaching this residual functional capacity ("RFC") determination, the ALJ considered the objective medical record detailed above, the medical opinion evidence, and McGinty's reported symptoms. With respect to the medical opinion evidence, the ALJ considered the opinion of state agency consultant Dr. Gavin and found her opinion persuasive.[55]  Dr. Gavin found that McGinty could perform a range of light work; could stand and walk for four hours and sit for six hours in an eight-hour day; could occasionally perform postural activities except he could never climb ladders, ropes, or scaffolds; required a cane to ambulate; and had certain environmental limitations.[56]  The ALJ reasoned that this opinion was supported by the unremarkable objective findings, the absence of any orthopedic treatment for McGinty's hip issues, the improvement of his shoulder pain with treatment, and his reported activities of daily living.[57]

---

[55] Tr. 42-43.

[56] Tr. 120-22.

[57] Tr. 43.

The ALJ found PA Williams' opinion only partially persuasive.[58] The ALJ reasoned that this opinion set forth limitations that were too extensive in light of the opinion's explanation and the objective medical record.[59] The ALJ further noted that this opinion was not consistent with the unremarkable objective findings, the absence of any orthopedic treatment for McGinty's hip issues, the improvement of his shoulder pain with treatment, and his reported activities of daily living.[60] The ALJ similarly found NP Hammon's opinion only partially persuasive, reasoning that the record supported some of her postural and environmental limitations with the exception of her sitting, standing, and walking limitations.[61] Finally, the ALJ considered the opinion of the state agency consultant at the initial stage, who opined that there was insufficient evidence to evaluate McGinty's impairments, and the ALJ found this opinion not persuasive.[62]

---

[58] Tr. 44.
[59] *Id.*
[60] *Id.*
[61] Tr. 43.
[62] Tr. 44.

12

With respect to McGinty's symptoms, the ALJ found that McGinty's statements concerning the intensity, persistence, and limiting effects of his impairments were not entirely consistent with the medical evidence.[63] McGinty testified that he had difficulty sitting, standing, and walking because of his pain.[64] He stated that he was unable to use stairs, needed a cane to ambulate, had reaching issues due to his shoulder pain, and struggled to complete household chores.[65] He further reported that his pain affected his concentration and focus, and that his pain made him short-tempered with others.[66]

The ALJ ultimately found McGinty's testimony to be inconsistent with the objective clinical findings.[67] The ALJ recounted the objective medical evidence, which included both normal and abnormal findings.[68] The ALJ noted the unremarkable imaging, 5/5 strength in his extremities, and improvement in his shoulder pain with injections, as

---

[63] Tr.
[64] Tr. 58.
[65] Tr. 60-62.
[66] Tr. 63.
[67] Tr. 40.
[68] Tr. 40-42.

13

well as findings of decreased strength and range of motion and imaging showing a potential rotator cuff tear.[69]   The ALJ also recounted McGinty's reported activities of daily living, including living alone, caring for animals, preparing meals, and shopping in stores.[70]  Ultimately, the ALJ found that McGinty was not as limited as he alleged.[71]

Having made these findings, the ALJ found at Step 4 that McGinty had no past relevant work but found at Step 5 that he could perform the occupations of an addresser, document preparer, and surveillance system monitor.[72] The ALJ relied on the VE testimony relating to how these jobs are performed, *i.e.*, that they were more technologically-based, but that the positions are performed "essentially as contemplated by the DOT[,]" including the functions, duties, exertional limits, and skill  levels, and that a person with McGinty's light exertional RFC could perform these jobs.[73]   Accordingly, the ALJ found that McGinty had not met the

---

[69] *Id.*
[70] Tr. 42.
[71] *Id.*
[72] Tr. 45.
[73] *Id.*

stringent standard prescribed for disability benefits and denied his claim.[74]

This appeal followed.[75] On appeal, McGinty argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to properly consider PA Williams' opinion, and because the jobs identified at Step 5 are obsolete.[76] This case is fully briefed and is therefore ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III. Discussion

### A. Substantial Evidence Review – the Role of this Court

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.[77] Substantial evidence "does not mean a large or considerable amount of evidence, but

---

[74] Tr. 46.

[75] Doc. 1.

[76] Doc. 12.

[77] *See* 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012).

15

rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[78]   Substantial evidence means less than a preponderance of the evidence but more than a mere scintilla.[79]

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence."[80]   However, where there has been an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence."[81]   The court must "scrutinize the record as a whole" to determine if the decision is supported by substantial evidence.[82]

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such

---

[78] *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

[79] *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

[80] *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted).

[81] Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).

[82] *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

16

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[83]   Under this standard, we must look to the existing administrative record to determine if there is "'sufficient evidence' to support the agency's factual determinations."[84]   Thus, the question before us is not whether the claimant is disabled, but rather whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was based upon a correct application of the law.[85]

When conducting this review, we must remain mindful that "we must not substitute our own judgment for that of the fact finder."[86]   Thus,

---

[83] *Biestek*, 139 S. Ct. at 1154 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[84] Id.

[85] *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

[86] *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)).

we cannot re-weigh the evidence. Instead, we must determine whether there is substantial evidence to support the ALJ's findings.  In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision.[87]  This does not require the ALJ to use "magic" words, but rather the ALJ must discuss the evidence and explain the reasoning behind his or her decision with more than just conclusory statements.[88]   Ultimately, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests."[89]

### B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which

---

[87] *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000).
[88] *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted).
[89] *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

has lasted or can be expected to last for a continuous period of not less than 12 months."[90]  This requires a claimant to show a severe physical or mental impairment that precludes him or her from engaging in previous work or "any other substantial gainful work which exists in the national economy."[91]  To receive benefits under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured.[92]

In making this determination, the ALJ follows a five-step evaluation.[93]  The ALJ must sequentially determine whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able

---

[90] 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a).

[91] 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a).

[92] 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

[93] 20 C.F.R. §§404.1520(a), 416.920(a).

to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").[94]

Between Steps 3 and 4, the ALJ must also determine the claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."[95]  In making this assessment, the ALJ must consider all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.[96]  Our review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by substantial evidence.[97]

The claimant bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents him or her from engaging in any past relevant work.[98]  If met, the burden then shifts to

---

[94] 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

[95] *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1).

[96] 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

[97] *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

[98] *Mason*, 994 F.2d at 1064.

the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that the claimant can perform consistent with the claimant's RFC, age, education, and work experience.[99]

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination. While some courts emphasize the necessity of medical opinion evidence to craft a claimant's RFC, other courts have taken the approach that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC."[100]  Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided."[101]

---

[99] 20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.
[100] *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006); *see also Biller v. Acting Comm'r of Soc. Sec.,* 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013).
[101] *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision.  Cases that emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence.[102] These cases simply restate the notion that medical opinions are entitled to careful consideration when making a disability determination.  On the other hand, when no medical opinion supports a disability finding or when an ALJ relies upon other evidence to fashion an RFC, courts have routinely sustained the ALJ's exercise of independent judgment based upon all the facts and evidence.[103]     Ultimately, it is our task to determine, considering the entire record, whether the RFC determination is supported by substantial evidence.[104]

---

[102] *Biller*, 962 F. Supp. 2d at 778–79.

[103] *See Titterington*, 174 F. App'x 6; *Cummings,* 129 F. Supp. 3d at 214–15.

[104] *Burns,* 312 F.3d 113.

C. Legal Benchmarks for the ALJ's Assessment of Medical Opinions

For applications filed after March of 2017, the regulations require ALJs to consider several factors to determine the persuasiveness of a medical opinion: supportability, consistency, relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion.[105] Supportability and consistency are the two most important factors, and an ALJ must explain how these factors were considered in his or her written decision.[106] Supportability means "[t]he more relevant the objective medical evidence and supporting explanations . . . are to support his or her medical opinion(s) . . . . the more persuasive the medical opinions . . . will be."[107] The consistency factor focuses on how consistent the opinion is "with the evidence from other medical sources and nonmedical sources."[108]

While there is an undeniable medical aspect to the evaluation of medical opinions, it is well settled that "[t]he ALJ – not treating or

---

[105] 20 C.F.R. § 404.1520c(c).
[106] 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *Blackman v. Kijakazi*, 615 F. Supp. 3d 308, 316 (E.D. Pa. 2022).
[107] 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).
[108] 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

examining physicians or State agency consultants – must make the ultimate disability and RFC determinations."[109]  When confronted with several medical opinions, the ALJ can choose to credit certain opinions over others but "cannot reject evidence for no reason or for the wrong reason."[110]  Further, the ALJ can credit parts of an opinion without giving credit to the whole opinion and may formulate a claimant's RFC based on different parts of different medical opinions, so long as the rationale behind the decision is adequately articulated.[111]   On the other hand, in cases where no medical opinion credibly supports the claimant's allegations, "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided."[112]

D. The ALJ's Decision is Supported by Substantial Evidence.

Our review of the ALJ's decision denying an application for benefits is significantly deferential.  Our task is simply to determine whether the ALJ's decision is supported by substantial evidence in the record; that is

---

[109] *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).
[110] *Mason*, 994 F.2d at 1066.
[111] *See Durden v. Colvin*, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016).
[112] *Cummings*, 129 F. Supp. 3d at 214–15.

"only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[113]   Judged against this deferential standard of review, we conclude that substantial evidence supported the ALJ's decision in this case.

McGinty first challenges the ALJ's consideration of PA Williams' opinion, arguing that the ALJ failed to address the supportability and consistency of this opinion as required.[114] McGinty contends that the ALJ failed to provide an adequate rationale for discounting the extreme limitations opined by PA Williams, relying on a lack of evidence instead of objective findings.  We disagree.  The ALJ recounted the entirety of the medical record, including records indicating McGinty needed a cane to ambulate, exhibited limited range of motion and decreased strength at times, and had an antalgic gait, and the MRI findings of a rotator cuff tear.[115]  But he also considered the records that indicated McGinty's shoulder symptoms improved with treatment, and that despite his complaints of hip pain, he never sought additional treatment for that

---

[113] *Biestek*, 139 S. Ct. at 1154.

[114] Doc. 12 at 5-9.

[115] Tr. 40-42.

impairment.[116]  The ALJ also noted the unremarkable objective findings, such as McGinty's ability in 2023 and 2024 to move his extremities without pain and that he demonstrated no focal neurological deficits, as well as the unremarkable imaging during the relevant period.[117]  Finally, the ALJ considered McGinty's activities of daily living, including his reported ability to care for pets, drive, shop in stores, and prepare meals.[118]  Ultimately, the ALJ concluded that PA William's extreme limitations were not consistent with or supported by these objective findings and McGinty's activities of daily living.[119]  We conclude that the ALJ's treatment of Williams' opinion is supported by substantial evidence.

McGinty also argues that the ALJ's Step 5 determination is not supported by substantial evidence because the jobs he identified— addresser, document preparer, and surveillance system monitor—are obsolete.[120]  Relying on Social Security Emergency Message ("EM") 24027

---

[116] Tr. 41-42.
[117] Tr. 42.
[118] *Id.*
[119] Tr. 44.
[120] Doc. 12 at 9-15.

REV,[121] the plaintiff contends that the ALJ failed to obtain the requisite testimony from the VE showing that he could perform these jobs as they are currently performed.[122]

We conclude that the ALJ's decision complied with the guidance set forth in EM-24027 REV. This emergency message instructs that ALJs may not rely on certain jobs at Step 5 for a finding of "not disabled" without additional VE evidence describing the occupation as it is currently performed.[123] If the ALJ intends to rely on jobs identified in the EM, the ALJ must solicit additional testimony from the VE to establish that, "as the occupation is currently performed: [i]ts requirements are consistent with the individual's RFC, and [i]t exists in the national economy in numbers that alone, or in combination with work in other cited occupations, are significant."[124] The three jobs identified

---

[121]Emergency Message 24027 REV ("EM-24027 REV") https://secure.ssa.gov/apps10/reference.nsf/links/01062025092030AM (last accessed May 14, 2026).

[122] Doc. 12 at 9-15.

[123] EM-24027 REV.

[124] *Id.*

by the ALJ in this case—addresser, document preparer, and surveillance system monitor—are listed in the EM.[125]

Here, we conclude that the ALJ's decision satisfies the requirements of the EM. At the evidentiary hearing, the VE identified the three positions above as jobs someone with McGinty's limitations could perform.[126] She then gave additional testimony as to how these jobs are performed currently:

> The way these jobs are performed today are essentially as described in the DOT. The main differences are that instead of paper and pencil it's more technology based.
>
> For example, they may use a handheld device or touchscreen or a laptop. The document preparer [ ] is not preparing items to be microfiched. They are preparing them to be scanned. And the surveillance system monitor position is no longer

---

[125] *Id.*
[126] Tr. 65.

> found at airports but you will find them in other businesses such as hotels, banks and retail.
>
> The amount of technology that's used is still being able to be learned within 30 days, keeping it at the unskilled level and, therefore, it would fit the parameters of your hypothetical.[127]

The VE testified that she was relying on the DOT and her 39 years of experience as a vocational rehabilitation counselor in making this determination.[128]

In finding that McGinty could perform these jobs and was "not disabled" at Step 5, the ALJ explicitly relied on this testimony to conclude that these jobs supported a finding of "not disabled."[129]   While the plaintiff asserts, without much support, that the VE's experience is not sufficient to establish that the jobs are *not* obsolete, courts have found in similar circumstances that a VE's experience is a sufficient basis on which an ALJ may rely in determining whether these jobs, as currently performed, permit a finding of "not disabled" at Step 5.[130]   Accordingly,

---

[127] Tr. 64-66.

[128] Tr. 66-67.

[129] Tr. 45-46.

[130] *See e.g.*, *Rose v. Bisignano*, 2026 WL 540781, at \*2-3 (E.D.N.C. Feb. 26, 2026) (finding reliance on VE testimony, including the VE's experience, sufficient to comply with EM-24027 Rev); *Tester-Kopec v.*

we conclude that the ALJ in this case complied with EM-24027 REV, and a remand is not warranted.

Given that the ALJ considered all the evidence and adequately explained the decision for including or discounting certain limitations as established by the evidence, we find no error with the decision. Therefore, under the deferential standard of review that applies to appeals of Social Security disability determinations, we conclude that substantial evidence supported the ALJ's evaluation of this case.

## IV.   Conclusion

For the foregoing reasons, the decision of the Commissioner in this case will be affirmed, and the plaintiff's appeal denied.

An appropriate order follows.

Submitted this 20th day of May 2026.

*s/ Daryl F. Bloom*
Daryl F. Bloom
Chief United States Magistrate Judge

---

*Comm'r of Soc. Sec.*, 2025 WL 3628110, at *9-10 (N.D. Oh. Dec. 15, 2025) (same). *But see Julia K. v. Comm'r of Soc. Sec.*, 2024 WL 3760344, at *3-4 (E.D.N.Y. Aug. 9, 2024) (finding the VE testimony insufficient to show that the number of document preparer positions, as currently performed, equates to those under the DOT).